## BROWN v. TRAVELERS' INS. CO. et al.[*]
### No. 4527.

Court of Appeal of Louisiana. Second Circuit.

March 31, 1933.

Foster, Hall, Barret & Smith, of Shreveport, for appellant.

Thatcher, Browne, Porteous & Myers, of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiff sues to recover compensation and physician's bill and medical expenses from his employer, the Lee Dry Goods Company, Incor-

*Rehearing granted as to question of doctors' bills, April 28, 1933.

porated, and its insurer, the Travelers' Insurance Company. The basis of his action and the nature and extent of his alleged injuries are clearly set forth and described in articles V and VI of his petition, which we quote:

"That on or about November 19, 1930, petitioner in the performance of his duties as an employee of the defendant, Lee Dry Goods Company, Inc., was assisting in moving a heavy case of dry goods weighing about six hundred pounds; and that in putting said shipping case on a baggage truck another employee of the Lee Dry Goods Company, Inc., pushed the heavy case off balance towards petitioner, and petitioner was forced to hold and support the heavy case to prevent it from falling on him; that the shipping case struck petitioner, bruising his forehead, and the blow and the heavy weight caused petitioner to strain the muscles and ligaments of the lower abdomen and the stomach and in the region of the testicles, and bruised and strained the right testicle and the cords and ligaments and arteries and glands in the pelvic region.

"That about one hour later, petitioner's right testicle and spermatic cord became swollen, causing great pain; that said swelling and pain and resulting inflammation in the region of the testicle and prostate gland, and the weakness of the muscles of the lower abdomen was so serious and disabling that petitioner was compelled to remain in bed nine days; and thereafter returned to do lighter work for the defendant not requiring physical exertion."

He further alleges that after returning to his work he remained under medical care and could not perform labor requiring physical exertion or lifting, without causing a return of the acute inflammation of the prostate gland and testicles, referred to in his petition; that shortly after he did return to work, his employer informed him that he was no longer able to do the work required of him and to seek other employment. He sues for compensation for 100 weeks on the ground that he has "suffered a serious impairment of the usefulness of the physical function of the muscles, tendons, nerves, cords and ligaments in the region of the lower abdomen and of the testicles and prostate gland."

In the alternative, he alleged that by reason of said accident, and since its date, "he has been partially disabled to do work of any reasonable character," and he believes and alleges that such disability will be permanent. He alleges that when injured he was receiving a monthly salary of $101.25, or $23.69 a week, and that he is now only able to earn, on account of said injuries, $75 per month.

On his alternative demand, he asks for 65 per cent. of the difference between his wages at the time of the accident and those paid him thereafter, for a period not to exceed 300 weeks.

Defendants deny that plaintiff was injured while in the employ of the Lee Dry Goods Company, Inc., and therefore deny that they are due to pay him compensation for the injury he claims to be suffering from, or for the disability, if any, resulting from such injuries. They admit he was paid a monthly salary of $101.25 at the time of his alleged injury.

Plaintiff's demands were rejected by the lower court, and he has appealed.

At the time of the alleged injury to him, plaintiff had been in the employ of the Lee Dry Goods Company for two years. His duties consisted of checking in and out shipments of goods, bringing down merchandise from up stairs, and performing such clerical work as he was directed to do by his superiors. He testified that at about 9:30 o'clock, the morning of his injury, he was called to the mezzanine floor of defendant's building to move a case of goods, weighing between four and five hundred pounds, to its warehouse; that he took a two-wheel baggage truck with him to effect the removol of the case, and, realizing that he could not do so alone, called a negro helper to assist him. This truck consisted of two parallel pieces, several feet long, under one end of which were two wheels, the opposite ends of which were so designed as to be used as handles by the person pushing or pulling the truck. Towards the handle end of the truck were two legs, about one foot high. When loaded, the truck rested on the two legs and the two wheels. The evidence does not show with certainty the length of this truck, over all, but it must have been around five feet. At its wheel end, there is a metal piece extending crosswise, and when the truck is raised to a perpendicular, or near perpendicular, position, this metal piece rests flatly against the floor. Heavy boxes are tilted slightly and this metal attachment is worked under them. These movements bring the truck against, or near to, the side of the box, and as the truck is pulled down from its vertical position to rest on legs and wheels, the box is held in position by the assistant so that when the truck rests, the box will be in proper position on it.

It was while in the act of loading the case of dry goods, in the manner above outlined, that plaintiff claims to have sustained injury. He was manipulating the handle end of the truck, while his colored assistant was looking after the other end. He says that as he pulled down on the handles the case "came over my way and got a little over-balanced, and I tried to hold it to keep it from coming over on me, and that is the way I got the strain." He further states that the box fell against his forehead and caused a "little skinned place there."

.Plaintiff says that he felt the strain in his back first, as he turned the case loose, and thirty or forty minutes later noticed it in his lower abdomen; that he sat down and rested a few minutes, and then went about his business, going over to Minden that day on business for his employer; that while riding on the trip to Minden, he "noticed that the testicle felt like it was hanging down too much, uncomfortable feeling." He consulted a physician at about 5:30 o'clock that evening, who advised him to go to bed. He did so, remaining so confined for nine days. During this period he was visited by Drs. Gill and Boyce, the latter being the family physician, and at its expiration he returned to work for defendant, with the understanding that he would not be required to perform heavy work or lifting until his condition improved. His employment continued until March 15, 1931, when voluntarily terminated by him. He then entered the service of a Shreveport bank, at a monthly wage of $60, which, after two months, was increased to $75. He was paid $101.25 per month by defendant until March 15, 1931; no deduction being made for the period of his illness or disability.

The negro man who assisted plaintiff load the box on the truck, though in the employ of defendant when the case was tried, was not called as a witness by either side. We have only plaintiff's version of the matter.

Dr. Gill examined plaintiff in his office the afternoon of the day of his alleged injury. He was given the history of the case by plaintiff, who, the doctor says, came to him for pain in the right testicle. He found slight swelling in this organ, that it was tender to touch, and that there was pus in the prostate gland. He also examined plaintiff three days before trial of the case, March 9, 1932, and from this examination he found a hard lump, about the size of the first joint of the index finger, at the lower end of the epididymus, an elongated body which is a portion of the testicle. The prostate was a little enlarged and again showed pus. It was Dr. Gill's opinion that this condition of plaintiff's testicle and epididymus was a logical result of a strain, such as he claims to have experienced, and that such condition was more likely to be caused by the strain than by the infected prostate gland; that he would be surprised to find conditions in the testicle and epididymus, such as plaintiff had, even though the prostate was infected, unless preceded by a strain. He modified this statement by admitting that escapage of the poisonous pus from the prostate into the spermatic cord, the epididymus, semen vessels, and testicles, would cause infection and produce swelling in those organs, and that this would be true regardless of the cause of the pus escapage. He stated that the passage of this pus into the organs below could come about without any strain, that it had been known to occur while the person was asleep, after attending a dance, etc., and that it could occur from an awkward step or jolt. He thought plaintiff's recovery was uncertain. Some cases respond promptly to treatment, while others do not.

Dr. Boyce visited plaintiff on November 21, two days after the alleged injury, and found him in bed with fever; his right testicle was swollen, with pain running up the spermatic cord into the abdomen. He stated that plaintiff and his father had decided plaintiff had appendicitis, but they were in error. He had treated plaintiff prior to the date of the injury for the infected prostate gland, every five to seven days, and also had treated two other members of his family for like disease, neither of which was venereal in origin. He agreed with Dr. Gill that plaintiff's condition was a logical result of a strain, and thought that this condition was caused by a strain, contributed to by the infected prostate gland. Dr. Boyce re-examined plaintiff three or four days before trial, and then found the same conditions as did Dr. Gill. He had seen cases of testicles swelling from infection of the prostate gland, with no history of trauma, but, in his opinion, 90 to 95 per cent. of swollen testicles result from straining. Any heavy work, such as lifting or straining, would aggravate the ailment, and a recurrence of the trouble in the future was more probable than it had been in the past. This physician gave the following testimony concerning the result of his treatment of plaintiff:

"Q. Doctor what would you say was the result of your treatment? A. The treatment alleviated the condition, but for some reason, I am not able to explain, I was never able to cure it. In most of those cases you are able to clear the pus out entirely and they get well, but this boy, for some reason, was never able to clear the pus up. I could not cure him.

"By Court: Q. Was the failure to respond to the treatment, due to the character of the disease or due to the fact that the young man had suffered a severe strain? A. I do not think that the strain had anything to do with it. You get an infected prostate gland occasionally that will not clear up. I know a man fifty-six years old that has been treated twenty-five years and still has pus, and he never had any strain.

"By Mr. Barrett: Q. Doctor, the symptoms resulting from the strain, that is the symptoms in the testicle, have they completely cleared up? A. The symptom in the testicle was the swelling, and of course it subsided. Of course the testicle may still be a little larger than the other one, but sometimes there is a difference in the size of the testicles. He never had any trouble with his testicles before the injury and for that reason I never examined them as to size, may have been larger before, but it is larger now."

The lump in the epididymus remained after

the treatment. He ascribed this condition directly to a strain, and was of the opinion that any one who worked a man afflicted with prostate infection ran the risk of experiencing the same trouble as has occurred in this case, and that the afflicted person takes chances by engaging in severe work or activity. He agreed with Dr. Gill in regard to the unknown causes for swollen testicles in many cases. He also stated that, had plaintiff not suffered the strain, he would have had to have his (the doctor's) services and treatment for the prostate infection; that he did not know plaintiff was engaged in heavy work before the injury to him; and that, if he had not had the strain, the chances are ninety to ten that he would not have had the swollen testicle.

Dr. Rigby, on behalf of defendants, examined plaintiff on December 30, 1930, and again on October 21, 1931. In the main, his testimony was not in conflict with that of Drs. Gill and Boyce. He did not think, however, that a strain was a common cause for conditions he found plaintiff to be suffering from, but was of the opinion disease was a common cause for such. It was his opinion, in view of the fact that the swelling of plaintiff's testicle began so early as eight hours after the strain, that the real cause of the swelling had its beginning before the strain.

Dr. Stamper made a special examination of plaintiff's genito-urinary tract a few days before this case was tried. . He found the prostate a little enlarged, spongy, with secretion of 95 per cent. pus, and a slight infection of the testicle and a lump at the head of the epididymus, about the size of the end of a small finger. His opinion about plaintiff's ailment generally affirmed those of the other physicians who testified in the case. He stated that massaging the prostate gland, as had been done with plaintiff, had a tendency to force the pus downward, and that he thought this pus had found its way into the epididymus and testicle before the strain, basing his opinion upon the undisputed facts of the case; that the feeling of discomfort in the testicle which plaintiff had while riding in a car to Minden the day of his injury was a natural and expected symptom of his case, and that plaintiff could be in his present condition had he not been strained.

■ We have analyzed the medical testimony of both sides in a desire to present the essential facts of the case from a pathological standpoint. Our deductions from this testimony are as follows: That plaintiff had a chronic infection of the prostate gland, which had been treated for some time prior to his injury by his family physician; that the pus accumulating in this gland does naturally find its way into the organs below, such as the cord, epididymus, and testicle, and will there bring about infection, resulting in inflammation and swelling; that a strain by the individual afflicted with a diseased prostate may be expected to aggravate the condition and hasten involvement of the lower organs, named above; that this disease generally yields to proper treatment, but that such treatment has failed to effect a cure of plaintiff's diseased gland; that it is imprudent for one so affected to engage in hard labor, violent exercise, or intemperate yielding to sexual passions, or too liberal refraining from sexual desires; that, by prudently observing his physician's advice, there is no good reason why plaintiff should not be able to do clerical work to his full capacity, and earn full compensation that is paid for such services.

■ The facts show unmistakably that when plaintiff returned to his work on December 1st, ten days after he was strained, he took up the same duties in which he was engaged before that time, excepting that it was understood that he would not be required to do any heavy lifting until he had recovered from the effects of his illness. He was paid the same salary to March 15th, thereafter, as he received previously, and left defendant's employ of his own volition. The letter given to and accepted by him from defendant's vice president is very complimentary of his good qualities, and states: "He leaves our firm of his own accord to enter the employ of one of the leading banking institutions of this city." So far as this record shows, had plaintiff so desired, he would to-day be in the employ of defendant, drawing the same salary he received when injured, unless reduced, along with the salaries of other employees, on account of business depression. The fact that he accepted a smaller salary from his new employer does not prove decrease in ability to perform the work for which he was best qualified. The prospect of promotion with gradual increase in salary may have influenced his actions. His salary was raised 25 per cent. at the end of sixty days' service with the bank, which indicates no lack of ability to satisfactorily discharge the duties of his new employment.

When plaintiff made out a report of his injury to the insurance company on December 10, 1930, he stated the probable period of his incapacity to be ten days. This evidently referred to the period he was confined to bed, because he had resumed work ten days previous, and was being paid full wages then. At the date of this report, he well knew his physical condition, yet no claim for disability was made beyond the period of confinement. It is passing strange that he, with full knowledge of his condition, should not have availed himself of this opportunity to disclose a consciousness of disability and incapacity beyond ten days, if such existed. If he did not consider then that he was disabled, thereafter there was less reason to do so, as the swollen condition of the testicle subsided and the pain, in the main, had abated.

A close study of all the testimony in the case convinces us that when plaintiff left defendant's employ his physical condition was as near normal as it had been prior to the strain. If it was not so, we do not think the difference can be properly ascribed to the strain or injury in November, 1930, but to the malignant condition of the prostate gland. of long standing, which is so stubborn that it refused to respond to medical treatment.

The judgment of the lower court is affirmed.

MILLS, J., recused.